**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| L.H., D.J., B.P., and J.F., on behalf of their minor children, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| INDEPENDENCE SCHOOL DISTRICT, | ) | **HEARING REQUESTED** |
| | ) | |
| Defendant. | ) | |

<u>**SUGGESTIONS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**</u>

# Table of Contents

I.    Background ............................................................................................................. 9

II.   Argument ............................................................................................................... 12

   A.  Standard for Preliminary Injunction ................................................................ 12

   B.  Plaintiffs easily meet the fair-chance standard. .............................................. 13

      1)  Plaintiffs have a First Amendment right to access ideas and information in school
      libraries and the automatic-removal policy violates that fundamental right ....................... 13

      2)  ISD's automatic-removal policy is unconstitutional because it creates a heckler's veto,
      constitutes a prior restraint, and sanctions viewpoint-based book removals. ...................... 17

         i.   The policy creates a heckler's veto ................................................... 19

         ii.  The policy is an unconstitutional prior restraint. ....................................... 21

      3)  ISD's automatic-removal policy violates due process because it deprives students of
      their fundamental right to free speech without notice, hearing, or the ability to appeal the
      final decision. ...................................................................................... 26

   C.  The remaining *Dataphase* factors favor entry of a preliminary injunction. .................... 28

      1)  Plaintiffs face the threat of irreparable harm. ......................................... 28

      2)  The balance of equities favors ongoing student access to library materials. ................ 29

      3)  The protection of students' First Amendment rights is in the public interest. .............. 29

   D.  Bond of $100 is appropriate. .................................................................... 30

III.  Conclusion ........................................................................................ 31

Case 4:22-cv-00801-RK   Document 8   Filed 12/06/22   Page 2 of 32

# Table of Authorities

**Cases**

*Abdullah v. Cty. of St. Louis*
  52 F. Supp. 3d 936 (E.D. Mo. 2014) ...................................................................... 30

*Ahmad v. City of St. Louis*
  2017 WL 5478410 (E.D. Mo. Nov. 15, 2017) ........................................................ 30

*Am. Civil Liberties of Mo. Found. v. Lombardi*
  23 F. Supp. 3d 1055 (W.D. Mo. 2014) ................................................................... 26

*Anheuser-Busch, Inc. v. VIP Prod., LLC*
  666 F. Supp. 2d 974 (E.D. Mo. 2008) .................................................................... 13

*Armstrong v. D.C. Pub. Library*
  154 F. Supp. 2d 67 (D.D.C. 2001) .......................................................................... 25

*Bantam Books, Inc. v. Sullivan*
  372 U.S. 58 (1963) ...................................................................................... 18, 21, 22

*Baughman v. Freienmuth*
  478 F.2d 1345 (4th Cir. 1973) ................................................................................ 23

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*
  457 U.S. 853 (1982) ......................................................................................... passim

*Bible Believers v. Wayne Cty.*
  805 F.3d 228 (6th Cir. 2015) .................................................................................. 19

*Brown v. Ent. Merchants Ass'n*
  564 U.S. 786 (2011) ............................................................................................... 16

*Burch v. Barker*
  861 F.2d 1149 (9th Cir. 1988) .......................................................................... 16, 23

*Cary v. Bd. of Ed. of Adams-Arapahoe Sch. Dist. 28-J, Aurora, Colo.*
  427 F. Supp. 945 (D. Colo. 1977) .......................................................................... 23

*Coates v. Cincinnati*
  402 U.S. 611 (1971) ............................................................................................... 25

*Counts v. Cedarville Sch. Dist.*
  295 F. Supp. 2d 996 (W.D. Ark. 2003) ...................................................... 14, 18, 28

3

*Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*
    533 F.3d 780 (9th Cir. 2008) ................................................................... 19

*Dataphase Systems, Inc. v. C L Systems, Inc.*
    640 F.2d 109 (8th Cir. 1981) .................................................................... 12

*Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*
    518 U.S. 727 (1996) .................................................................................. 29

*Doe v. South Iron R-1 School Dist.*
    453 F. Supp. 2d 1093 (E.D. Mo. 2006) ................................................... 29

*Doe v. Univ. of Nebraska*
    451 F. Supp. 3d 1062 (D. Neb. 2020) ...................................................... 26

*Edwards v. Aguillard*
    482 U.S. 578 (1987) .................................................................................. 15

*Elrod v. Burns*
    427 U.S. 347 (1976) .................................................................................. 27

*Embry v. Lewis*
    215 F.3d 884 (8th Cir. 2000) .................................................................... 25

*Epperson v. Arkansas*
    393 U.S. 97 (1968) .................................................................................... 15

*Forsyth Cty. v. Nationalist Movement*
    505 U.S. 123 (1992) ...................................................................... 18, 19, 25

*Fort Wayne Books, Inc. v. Indiana*
    489 U.S. 46 (1989) .................................................................................... 22

*Free & Fair Election Fund v. Missouri Ethics Comm'n*
    252 F. Supp. 3d 723 (W.D. Mo. 2017) .................................................... 12

*Freedman v. Maryland*
    380 U.S. 51 (1965) .................................................................................... 21

*Fujishima v. Bd. of Ed.*
    460 F.2d 1355 (7th Cir. 1972) .................................................................. 23

*Fuller v. Norman*
    936 F. Supp. 2d 1096 (W.D. Mo. 2013) .................................................. 29

Case 4:22-cv-00801-RK   Document 8   Filed 12/06/22   Page 4 of 32

*Hazelwood Sch. Dist. v. Kuhlmeier*
  484 U.S. 260 (1988) ....................................................................... 15, 16, 25

*Heartland Acad. Cmty. Church v. Waddle*
  335 F.3d 684 (8th Cir. 2003) ....................................................................... 13

*Heller v. New York*
  , 413 U.S. 483, 492 (1973) ....................................................................... 22

*Hill v. Colorado*
  530 U.S. 703, 120 S. Ct. 2480, 147 L.Ed.2d 597 (2000)....................................... 18

*Jacobsen v. Petersen*
  728 F. Supp. 1415 (D.S.D. 1990) ....................................................................... 27

*Johnson v. Bd. of Police Comm'rs*
  351 F. Supp. 2d 929 (E.D. Mo. 2004) ....................................................................... 30

*Johnson v. Minneapolis Park & Recreation Bd.*
  729 F.3d 1094 (8th Cir. 2013) ....................................................................... 27

*Keyishian v. Bd. of Regents*
  385 U.S. 589 (1967) ....................................................................... 14

*Lamont v. Postmaster General*
  381 U.S. 301 (1965) ....................................................................... 18

*Lovell v. City of Griffin*
  303 U.S. 444 (1938) ....................................................................... 18

*Mahanoy Area Sch. Dist. v. B.L.*
  141 S. Ct. 2038 (2021)....................................................................... 8, 13, 15

*Martin v. Struthers*
  319 U.S. 141 (1943) ....................................................................... 18

*Meyer v. Nebraska*
  262 U.S. 390 (1923) ....................................................................... 15

*Minarcini v. Strongsville City Sch. Dist.*
  541 F.2d 577 (6th Cir. 1976)....................................................................... 14

*Minn. Citizens Concerned for Life, Inc. v. Swanson*
  692 F.3d 864 (8th Cir. 2012) ....................................................................... 12, 27

5

*Ohlensehlen v. Univ. of Iowa*
   509 F. Supp. 3d 1085 (S.D. Iowa 2020) ................................................................. 30

*Org. for a Better Austin v. Keefe*
   402 U.S. 415 (1971) .............................................................................................. 21

*O'Toole v. City of Walnut Grove*
   238 F. Supp. 3d 1147 (W.D. Mo. 2017) ................................................................ 30

*Parents, Fams., & Friends of Lesbians & Gays, Inc. v. Camdenton R-III Sch. Dist.*
   853 F. Supp. 2d 888 (W.D. Mo. 2012) ...................................................... 11, 28, 29

*Pence v. City of St. Louis*
   958 F. Supp. 2d 1079 (E.D. Mo. 2013) ................................................................. 30

*Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.*
   460 U.S. 37 (1983) ................................................................................................ 25

*Phelps-Roper v. Cty. of St. Charles*
   780 F. Supp. 2d 898 (E.D. Mo. 2011) ................................................................... 27

*Phelps-Roper v. Nixon*
   545 F.3d 685 (8th Cir. 2008) ........................................................................... 28, 29

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*
   413 U.S. 376 (1973) .............................................................................................. 21

*Planned Parenthood Minn. v. Rounds*
   530 F.3d 724 (8th Cir. 2008) ................................................................................ 12

*Police Dep't of City of Chicago v. Mosley*
   408 U.S. 92 (1972) ................................................................................................ 17

*Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*
   670 F.2d 771 (8th Cir. 1982) ........................................................... 11, 13, 14, 28

*Quantity of Books v. Kansas*
   378 U.S. 205 (1964) .............................................................................................. 23

*Reitman v. Mulkey*
   387 U.S. 369 (1967) .............................................................................................. 17

*Robb v. Hungerbeeler*
   281 F. Supp. 2d 989 (E.D. Mo. 2003) ................................................................... 19

6

*Rodgers v. Bryant*
    942 F.3d 451 (8th Cir. 2019) ........................................................ 12

*Shelley v. Kraemer*
    334 U.S. 1 (1948) ...................................................................... 17

*Singleton v. Cecil*
    176 F.3d 419 (8th Cir. 1999) ........................................................ 26

*Stahl v. City of St. Louis, Mo.*
    687 F.3d 1038 (8th Cir. 2012) (reviewing ...................................... 12

*Stanley v. Georgia*
    394 U.S. 557 (1969) .................................................................... 13

*Stevenson v. Blytheville Sch. Dist. #5*
    800 F.3d 955 (8th Cir. 2015) ........................................................ 26

*Stockslager v. Carroll Elec. Co-op. Corp.*
    528 F.2d 949 (8th Cir. 1976) ........................................................ 30

*Sund v. City of Wichita Falls*
    121 F. Supp 2d 530 (N.D. Tex. 2000) ............................................ 20

*Susan B. Anthony List v. Driehaus*
    573 U.S. 149 (2014) .................................................................... 11

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*
    393 U.S. 503 (1969) ............................................................... 14, 19

*Traditionalist Am. Knights of Ku Klux Klan v. City of Desloge.*
    914 F. Supp. 2d 1041 (E.D. Mo. 2012) .......................................... 30

*Traditionalist Am. Knights of Ku Klux Klan v. City of Desloge*
    983 F. Supp. 2d 1137 (E.D. Mo. 2013) .......................................... 30

*U.S. v. Nat'l Treasury Emps. Union*
    513 U.S. 454 (1995) .................................................................... 18

*Vance v. Universal Amusement Co.*
    445 U.S. 308 (1980) ............................................................... 22, 23

*West Va. State Bd. of Educ. v. Barnette*
    319 U.S. 624 (1943) ............................................................... 14, 15

Case 4:22-cv-00801-RK   Document 8   Filed 12/06/22   Page 7 of 32

*Wickersham v. City of Columbia*
    481 F.3d 591 (8th Cir. 2007) ................................................................................ 17

*Wilkinson v. Austin*
    545 U.S. 209 (2005) ........................................................................................... 26

*Zamecnik v. Indian Prairie Sch. Dist. No. 204*
    636 F.3d 874 (7th Cir. 2011) .............................................................................. 19

**Statutes**

U.S. Const. amend. XIV, § 1 .................................................................................. 26

**Rules**

Fed. R. Civ. P. 17(a)(1)(C) .................................................................................... 11

Fed. R. Civ. P. 17(c)(1) ......................................................................................... 11

Fed. R. Civ. P. 65(c) ............................................................................................. 30

As "the nurseries of democracy," public schools "have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021). In contravention of this principle, and in violation of students' First Amendment right to access ideas and information in school libraries free from viewpoint-based censorship and to due process of law, Defendant Independence School District (ISD) maintains a policy of automatically removing challenged materials, including books, from all school libraries upon receipt of the complaint, without notice, and before any review has been conducted. Moreover, after the vote of the Board of Education (Board), which is a final decision, there is no appeal process. This Court should enter a preliminary injunction enjoining ISD from enforcing its automatic-removal policy.

## I.   <u>Background</u>

ISD, like many school districts across the country, follows a deliberate process to select items for inclusion in its libraries. In this process, a librarian with "a thorough knowledge of the curriculum, the strengths and weaknesses of the current collection, and an understanding of the students' abilities and skills" considers widely recognized selection criteria, based on the American Library Association's Library Bill of Rights, to determine whether a book is "educational and enjoyable" and appropriate for "recreational reading." Ex. 1 (Board Regulation 6310); *see also* Ex. 2 (Board Policy 6310) ("The library/media program serves as a point of access to information and ideas for students as they acquire critical thinking and problem-solving skills."); Ex. 3 (Board Policy 6241) ("Every effort will be made to provide materials that present all points of view concerning international, national and local problems and issues of our times").

9

ISD policy, however, despite this careful selection process, departs from how school districts usually operate libraries in that it maintains an automatic-removal policy allowing any student, parent, or guardian who seeks to restrict library material from circulation to file a complaint triggering the almost immediate removal from library shelves pending committee review and Board vote. A book need only be considered "objectionable in any manner" by the person challenging it, and all that is required is that they fill out and submit a simple form to ISD. Ex. 1 (Board Regulation 6310); Ex. 4 (Board Regulation 6241). The form does not include any attestation or requirement that the challenger has read the entire text in question or considered the value of the work as a whole. It merely asks: "To what part of the material do you object? Cite words, page numbers"; "Why do you object to this material?"; "Are you familiar with the range of materials used in the school system on this topic?; and "Do you approve of presenting a diversity of points of view about this material in the classroom? *See, e.g.*, Ex. 5 (previous complaint form submitted, committee notes, and committee report). Upon submission of the form, ISD's automatic-removal policy requires school officials to remove all electronic and hard copies of the material from circulation, thereby prohibiting any student from accessing the material—regardless of the basis for the challenge or its merit. Ex. 4 (Board Regulation 6241). The automatic-removal policy is the same for all schools and grade levels.

Under ISD's automatic-removal policy, challenged material is removed from circulation until the following steps are complete: the Superintendent appoints a review committee; the appointed committee meets and prepares a written recommendation; the Superintendent forwards the recommendation to the Board; and the Board votes. Ex 4 (Board Regulation 6241). While

there are timelines in the policy, it is not clear that they are strictly enforced. *See* Ex. 5.[1]

Additionally, there is no notice to students (or parents) that a book has been removed and no standard governs the Board's ultimate decision; it can completely ignore the review committee's recommendation, follow it to the letter, or adapt it how it sees fit. Once the Board's decision is made, there is no appeal process.

As an example of how this unconstitutional policy has been enforced, Plaintiffs refer this Court to the challenge and removal of the book *Cats vs. Robots #1: This Is War*. *See* Ex. 5; Ex. 6 (June 14, 2022 Board Minutes, at p. 12, stating that "the Administration followed Board of Education Policy and Regulation 6241"). On June 14, 2022, the Board voted to permanently remove the book from elementary school libraries but did not extend the permanent removal decision to middle and high school libraries. Ex. 6.

Plaintiffs' minor children are students in elementary, middle, and high school who have used, and plan to continue to use, the libraries at their respective ISD schools. Ex. 7 (L.H. Decl.); Ex. 8 (D.J. Decl.); Ex. 9 (B.P. Decl.); Ex.10 (J.F. Decl.). Plaintiffs bring this lawsuit on behalf of their minor children.[2] Plaintiffs, on behalf of their minor children, have standing to bring this

---

[1] This documentation of a previous enforcement of the policy indicates that a challenge was submitted on April 25, 2022. At the first committee meeting on May 25, 2022, the notes state that it had 20 days from the appointment of the committee, pursuant to Board policy, to perform the evaluation and make a recommendation. The notes state this date would was June 6, 2022. This deadline would mean that the committee was appointed on May 17, 2022—twenty days before June 6, 2022. This demonstrates a delay in the committee appointment, in that, the Superintendent had fifteen days to appoint a committee after receiving the complaint. Fifteen days from April 25, 2022, the date of the complaint, was May 10, 2022.

[2] Under the Federal Rules of Civil Procedure, a lawsuit may be prosecuted on behalf of a real party in interest by the real party's guardian without joining the minor children themselves. *See* Fed. R. Civ. P. 17(a)(1)(C) (providing that guardians "may sue in their own names without joining the person for whose benefit the action is brought"); Fed. R. Civ. P. 17(c)(1) (providing that "a general guardian" "may sue . . . on behalf of a minor").

these claims related to the restriction of library materials. *See, e.g.*, *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 856 (1982) (plurality) (noting plaintiffs were students in district's high school and junior high school); *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake, Minn.*, 670 F.2d 771, 773 (8th Cir. 1982) (same); *accord Parents, Fams., & Friends of Lesbians & Gays, Inc. v. Camdenton R-III Sch. Dist.*, 853 F. Supp. 2d 888, 897 (W.D. Mo. 2012) ("*PFLAG*"). In addition, enforcement of the policy has occurred, and future enforcement of the policy is sufficiently imminent as it continues to remain in place and any student, parent, or guardian could submit a challenge at any time triggering enforcement of the automatic-removal policy. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–67 (2014) (discussing pre-enforcement challenges seeking prospective relief).

## II.     <u>Argument</u>

### A. Standard for Preliminary Injunction

In considering a motion for preliminary injunction, this Court must determine: (a) whether Plaintiffs are likely to prevail on the merits; (b) if there exists a threat of irreparable harm to them absent the injunction; (c) the balance between this harm and the injury that the injunction's issuance would inflict upon ISD; and (d) what is in the public interest. *See Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). In this case, a preliminary injunction should issue because Plaintiffs are likely to succeed on the merits of their First Amendment and Due Process claims. "When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc) (citation omitted); *accord Free & Fair Election Fund v. Missouri Ethics Comm'n*, 252 F. Supp. 3d 723, 737 (W.D. Mo. 2017). Once the

12

likelihood of success on a First Amendment claim has been established, the remaining three factors may be found without further consideration. *Rodgers v. Bryant*, 942 F.3d 451, 457 (8th Cir. 2019). Moreover, free speech and due process claims are often closely related. *See generally, e.g.*, *Stahl v. City of St. Louis, Mo.*, 687 F.3d 1038 (8th Cir. 2012) (reviewing a facial challenge to a city ordinance alleged to be a restriction of free speech but deciding the issue on due process grounds).

In this case challenging a policy, not a statute, Plaintiffs need show only that they have a "fair chance of prevailing" on the merits. *Planned Parenthood Minn. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). This standard is less "rigorous" than the standard applied to preliminarily "enjoin the implementation of a duly enacted state statute." *Id.* Thus, Plaintiffs are "not required to prove a mathematical (greater than fifty percent) probability of success on the merits." *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003); *accord Anheuser-Busch, Inc. v. VIP Prod., LLC*, 666 F. Supp. 2d 974, 981 (E.D. Mo. 2008).

### B. Plaintiffs easily meet the fair-chance standard.

#### 1) Plaintiffs have a First Amendment right to access ideas and information in school libraries and the automatic-removal policy violates that fundamental right.

"[T]he Constitution protects the right to receive information and ideas, . . . This right to receive information and ideas . . . is fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). This First Amendment right extends to ISD students. "America's public schools are the nurseries of democracy." *Mahanoy Area Sch. Dist.*, 141 S. Ct. at 2046. As the United States Supreme Court recognized more than 40 years ago, "just as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic,

often contentious society in which they will soon be adult members." *Pico*, 457 U.S. at 867 (plurality). The First Amendment right to receive ideas extends to public school students and is "directly and sharply implicated by the removal of books from the shelves of a school library." *Id.*

Students' right to receive information in school is also well established in the Eighth Circuit. In *Pratt*, the Eighth Circuit held that, when a school district censored a school display of a film adaptation of a short story (there, Shirley Jackson's "The Lottery") and an accompanying trailer, "[w]hat is at stake is the right to receive information and to be exposed to controversial ideas – a fundamental First Amendment right." *Pratt v. Indep. Sch. Dist. No. 831, Forest Lake*, 670 F.2d 771, 779 (8th Cir. 1982). School policy may not suppress the ideas and viewpoints expressed in school library materials. While not all materials that are accessible in schools are "comforting" to students, "there is more at issue . . . than the sensibilities of those viewing the films" or reading the materials. *Pratt*, 670 F.2d at 779. When it removes materials, a school "use[s] its official power to perform an act clearly indicating that the ideas contained in [those materials] are unacceptable and should not be discussed or considered." *Id.* That is unconstitutional. *Id.* "In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969).

The First Amendment right to receive ideas is at its peak in a school library. "[T]he special characteristics of the school *library* make that environment especially appropriate for the recognition of the First Amendment rights of students." *Pico*, 457 U.S. at 868. The school library is "the principal locus" of students' freedom "'to inquire, to study and to evaluate, to gain new maturity and understanding.'" *Id.* at 869 (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589

(1967)); *accord Pratt*, 670 F.2d at 776; *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 583 (6th Cir. 1976) (observing that a school library "is a mighty resource in the free marketplace of ideas"); *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 1002-05 (W.D. Ark. 2003). ISD's automatic removal of books from school libraries upon receipt of a complaint infringes upon students' First Amendment right to access ideas and information.

"Boards of Education . . . have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights." *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). Indeed, "[t]hat they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Id.* "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Id.* at 642. *See also Meyer v. Nebraska,* 262 U.S. 390 (1923) (finding state law prohibiting the teaching of foreign languages in public or private schools to be unconstitutional); *Epperson v. Arkansas,* 393 U.S. 97, 104 (1968) (striking down prohibition against teaching of Darwinian evolution theory and noting "[o]ur courts, however, have not failed to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry and of belief"); *Pico*, 457 U.S. at 870 (plurality) (School boards "rightly possess significant discretion to determine the content of their school libraries. But that discretion may not be exercised in a narrowly partisan or political manner."); *Edwards v. Aguillard,* 482 U.S. 578 (1987) (invalidating state statute that required instruction on "creation science" theory to

accompany teaching of evolution); *Mahanoy*, 141 S. Ct. at 2046 ("Our representative democracy only works if we protect the 'marketplace of ideas.'").

*Hazelwood School District v. Kuhlmeier* did not change the equation for protecting constitutional rights in school libraries. 484 U.S. 260, 271 (1988). In holding "that educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns," the *Hazelwood* Court carved out certain types of activities without questioning *Pico*. *Id*. at 273. "[E]ducators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school" does not confer authority to engage in viewpoint-based censorship of library materials, in violation of students' First Amendment right to *access* information and ideas according to their own best lights. Nor do automatic and viewpoint-based book removals address any "legitimate pedagogical concerns." *Id.* at 271.

As the Supreme Court itself recognized in *Pico*, school board discretion does not extend "beyond the compulsory environment of the classroom, into the school library and the regime of voluntary inquiry that there holds sway." 457 U.S. at 869 (plurality). "[T]he only books at issue in this case are *library* books, books that by their nature are optional rather than required reading." *Id*. at 861–62. Not all library books are part of the school curriculum; in fact, many are simply there for students to enjoy and not required reading at all. *See Burch v. Barker*, 861 F.2d 1149, 1157 (9th Cir. 1988) ("Implicit in both these opinions in *Pico* is the premise that control over the educational curriculum requires control by administrators over the content of what is taught; this is a premise made more explicit in *Kuhlmeier*. The corollary of this premise is that no

16

similar content control is justified for communication among students which is not part of the educational program.").

The enforcement of an automatic-removal policy effectively grants unlimited discretion to any book challenger, *not* to the Board. Regardless of the merit of their challenge, one parent, student, or guardian can unilaterally restrict access for all students in the entire school district before any formal review occurs. This policy and the discretion to a single person disregards the professional capability of library professionals and the criteria applied in selecting appropriate materials for school libraries. Thus, while government officials "possess[] legitimate power to protect children from harm, . . . that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) (internal citations omitted).

> 2) **ISD's automatic-removal policy is unconstitutional because it creates a heckler's veto, constitutes a prior restraint, and sanctions viewpoint-based book removals.**

Pursuant to ISD's policy, "[s]tudents or parents/guardians . . . may make a formal complaint" against any material in the library that they find "objectionable in any manner." Ex. 1 (Board Regulation 6310). ISD then automatically and nearly immediately removes the material—regardless of the stated or pretextual basis for the challenge, the challenge's merit, whether the material has been challenged previously, or whether the challenge is viewpoint based—thereby blocking access by *every* student to that material before any review is conducted or a Board vote occurs. This automatic-removal policy violates Plaintiffs' right to access

17

information free from viewpoint-based censorship because it grants every student, parent, and guardian a heckler's veto and is an impermissible prior restraint.[3]

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). "The right to read a book is an aspect of the right to receive information and ideas, an 'inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution.'" *Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 999 (W.D. Ark. 2003), *quoting Pico*, 457 U.S. at 867. *Pico* continues:

> First, the right to receive ideas follows ineluctably from the sender's First Amendment right to send them: 'The right of freedom of speech and press ... embraces the right to distribute literature, and necessarily protects the right to receive it.' *Martin v. Struthers*, 319 U.S. 141, 143 (1943) (citation omitted). 'The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers.' *Lamont v. Postmaster General*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring).

457 U.S. at 867; *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) (citing *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938)) ("the constitutional guarantee of freedom of the press embraces the circulation of books as well as their publication"); *Hill v. Colorado*, 530 U.S. 703, 728, 120 S. Ct. 2480, 147 L.Ed.2d 597 (2000) (declaring the First Amendment protects

---

[3] That ISD acts on a complaint by a private party does not make its policy any more constitutional. It is school officials who block access to school library materials, and they are compelled to do so by ISD policy. The restriction remains state action. *See, e.g.*, *Wickersham v. City of Columbia*, 481 F.3d 591, 598 (8th Cir. 2007) (enjoining enforcement of speech restrictions where police enforced them at private entity's direction); *Shelley v. Kraemer*, 334 U.S. 1, 20 (1948) (holding restrictive covenant pertaining to St. Louis home in agreement between private parties subject to constitutional challenge where state granted judicial enforcement of restrictive covenant); *see also Reitman v. Mulkey*, 387 U.S. 369, 381 (1967) (upholding constitutional challenge to state law that "authorize(s) racial discrimination in the housing market" by private parties). Here, the ISD policy requiring officials to cut off access to books in response to any complaint is the cause of the censorship.

"the right of every citizen to reach the minds of willing listeners" (citations and internal quotations omitted)); *U.S. v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 470 (1995) (reasoning that a "large-scale disincentive to Government employees' expression also imposes a significant burden on the public's right to read and hear what the employees would otherwise have written and said"). By removing access to the ideas and information contained in a book automatically and nearly immediately upon receipt of a challenge, ISD's policy violates the First Amendment.

### i. The policy creates a heckler's veto.

ISD's automatic-removal policy is a heckler's veto in that it prevents students from accessing the ideas and information contained in each book it automatically removes from library shelves based on a single person's challenge, regardless of its merit, and before any review or vote occurs. It is a bedrock First Amendment principle that the government may not enact a "heckler's veto," suppressing speech because others might react negatively to it. *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134–35 (1992). "Listeners' reaction to speech is not a content-neutral basis for regulation," *id.*, nor is it typically a viewpoint-neutral one. *See also Bible Believers v. Wayne Cty.*, 805 F.3d 228, 248 (6th Cir. 2015) ("The heckler's veto is precisely that type of odious viewpoint discrimination."). Accordingly, "[s]peech cannot be . . . punished or banned[] simply because it might offend a hostile mob." *Forsyth*, 505 U.S. at 135; *see also Robb v. Hungerbeeler*, 281 F. Supp. 2d 989, 1002 (E.D. Mo. 2003), *aff'd*, 370 F.3d 735 (8th Cir. 2004) (finding that the Ku Klux Klan's "expressive speech of picking up trash along a highway right-of-way cannot be trumped because some people may disagree with its beliefs and advocacy").

Courts apply the heckler's veto doctrine to restrictions in the school context. "In order for the State in the person of school officials to justify prohibition of a particular expression of

19

opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 514 (finding school's prohibition on expression of armband-wearing improper where "the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities"); *see also Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011) (noting that *Tinker* "endorse[d] the doctrine of the heckler's veto"); *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 790 (9th Cir. 2008) ("There is, however, no precedent for a 'minors' exception to the prohibition on banning speech because of listeners' reaction to its content. It would therefore be an unprecedented departure from bedrock First Amendment principles to allow the government to restrict speech based on listener reaction simply because the listeners are children.").

This prohibition on heckler's vetoes applies in the school library context. In *Sund v. City of Wichita Falls*, the court held that a resolution "[c]onferring upon any 300 patrons the power to remove from the children's section [of a public library] any books they find objectionable" constituted an unconstitutional "heckler's veto" because it "effectively permit[ted] the [complaining patrons] to veto lawful, fully-protected expression simply because of their adverse reaction to it." 121 F. Supp 2d 530, 549 (N.D. Tex. 2000). Indeed, the policy at issue in *Sund* was less odious than the ISD policy at issue here. In that case, access to library materials was not completely blocked; rather, challenged books were moved to a different section of the library. *Id.* at 534. Moreover, the demand to move the material had to be signed by 300 challengers. *Id.* Nonetheless, the court recognized that the policy not only "allow[ed] any special interest group to suppress Library materials on the basis of their content, [but] actually facilitate[d] an infinite

20

number of content—and viewpoint-based speech restrictions." *Id.* Pursuant to the policy, "[a]ny group of patrons with a particular viewpoint or agenda [could] suppress books with which they disagree, from [any challenged materials] to, conceivably, . . . children's Bibles located in [school libraries]." *Id.*

The same is true here. The ISD policy requires the removal of any book from library shelves as soon as any parent, guardian, or student objects to it being in the library for any reason. *See* Ex. 1 (Board Regulation 6310); Ex. 4 (Board Regulation 6241) (requiring automatic removal whenever someone finds library material "objectionable in any manner"). This impermissibly turns on the reaction of those listeners to the viewpoints and ideas described in the books: i.e., a parent who does not want their child to learn about a non-binary character in a children's book. *See* Ex. 5.

### ii. The policy is an unconstitutional prior restraint.

The automatic-removal policy also imposes a prior restraint on any school library book about which a parent, guardian, or student complains. It shares the "special vice" of all prior restraints, in that it restricts the exercise of a First Amendment right "before an adequate determination that [the speech at issue] is unprotected." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973). Rather than consider the merits of any complaint *before* restricting access to the challenged material, ISD requires automatic and near-immediate removal, even if, as the example with *Cats vs. Robots #1: This Is War* bears out, the book is later permanently removed from some, but not all, libraries. *See* Ex. 5, Ex. 6.

Because prior restraints tend to suppress protected speech and enable arbitrary or discriminatory—including viewpoint-based—enforcement, they "come[] to [court] bearing a heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372

U.S. 58, 70 (1963). The government "carries a heavy burden of showing justification" to overcome that presumption. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971). In particular, the government must establish that the prior restraint scheme includes (1) narrow, objective, and definite standards to guide the permission-granting authority, *Shuttlesworth*, 394 U.S.at 150–51, and (2) robust procedural safeguards to protect First Amendment rights, *Freedman v. Maryland*, 380 U.S. 51, 58–59 (1965). The automatic-removal policy fails on both counts.

As noted, ISD library materials are selected in accordance with professional standards and automatic removals include these materials. *See* Ex. 1 (Board Regulation 6310) (policy describing criteria for book selection). Instead of trusting in this selection process, access is immediately blocked for all students to carefully selected material as soon as someone "finds it objectionable in any manner" without notification to parents or students of the material to which they no longer have access. Ex. 1 (Board Regulation 6310). In the example of *Cats vs. Robots #1: This Is War*, parents were told via email only *after* the final Board vote that the book had been removed. *See* Ex. 7 (L.H. Decl.); Ex. 8 (D.J. Decl.); Ex. 9 (B.P. Decl.); Ex. 10 (J.F. Decl.). Students were never informed directly and were told of the removal, if at all, only by their parents. *See* Ex. 7 (L.H. Decl.); Ex. 8 (D.J. Decl.); Ex. 9 (B.P. Decl.); Ex. 10 (J.F. Decl.). Moreover, while parents with students in ISD schools were eventually informed of the book removal, this notice occurred after the final decision was made and no notice at all was required by Board Policy or Regulation.

Prior restraint jurisprudence applies to both the spoken and written word. The Supreme Court has struck down unconstitutional prior restraints when government officials remove access to allegedly "obscene" written materials without appropriate process, including access for

minors. *See, e.g.*, *Bantam*, 372 U.S. at 71 (holding that government could not deny minors access to publications deemed "'objectionable' without further elucidation;" as such denial "curtail[ed] constitutionally protected expression"). Until a court has made a "judicial determination of the obscenity issue in an adversary proceeding," "books or any other expressive materials" cannot be removed from circulation. *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63 (1989) (quoting *Heller v. New York*, 413 U.S. 483, 492 (1973)). "While a single copy of a book or film may be seized and retained for evidentiary purposes based on a finding of probable cause, the publication may not be taken out of circulation completely until there has been a determination of obscenity after an adversary hearing." *Id*. (citing *Heller* at 492–93).

In *Vance v. Universal Amusement Co*., 445 U.S. 308 (1980), the Supreme Court reviewed a nuisance statute that allowed for an indefinite restraint of movies shown at an adult-only theatre without a judicial determination of obscenity and without a guarantee of prompt review. The court concluded that the statute was an unconstitutional prior restraint because of "the absence of any special safeguards governing the entry and review of orders restraining the exhibition of named or unnamed motion pictures, without regard to the context in which they are displayed." *Id*. at 317. *See also A Quantity of Books v. Kansas*, 378 U.S. 205, 208-10 (1964) (finding procedures authorizing "repressive" seizure of books to be an unconstitutional prior restraint "because they did not adequately safeguard against the suppression of nonobscene books"); *In Re. A Court of Mist and Fury*, Case No. CL22-1984; Circuit Ct. for the City of Virginia Beach (Aug. 30, 2022) (declaring unconstitutional statute purporting to allow any individual to file a petition claiming that a book is obscene; vacating lower court determination of probable cause for obscenity).

Courts limit the authority of school districts to impose prior restraints. *Cary v. Bd. of Ed. of Adams-Arapahoe Sch. Dist. 28-J, Aurora, Colo*., 427 F. Supp. 945, 955 (D. Colo. 1977), aff'd, 598 F.2d 535 (10th Cir. 1979) (finding that school policy "prohibiting the use of any material not included in the list of 1275 books without first obtaining approval of the Division of Instructional Services is the kind of broad prior restraint which is particularly offensive to First Amendment freedom"); *Fujishima v. Bd. of Ed*., 460 F.2d 1355, 1357 (7th Cir. 1972) (finding school policy requiring "prior approval of publications" to be "unconstitutional as a prior restraint in violation of the First Amendment"); *Baughman v. Freienmuth*, 478 F.2d 1345, 1350 (4th Cir. 1973) (striking down school policy for prior approval of materials to be distributed which provided "no safeguards whatever against the suppression of nonobscene, and therefore constitutionally protected, matter"); *Burch v. Barker*, 861 F.2d 1149, 1155 (9th Cir. 1988) (finding that school district's "blanket policy of unlimited scope and duration" restricting the distribution of all written materials was overbroad prior restraint in violation of the First Amendment).

ISD does not follow a constitutionally sufficient process for initially assessing the merits of the challenger's assertion that a book is "objectionable in any manner" and the appropriateness of the material. Any formally submitted objection for *any* reason to *any* book results in automatic removal pending review and Board vote, and ISD is not required to distinguish objections based on viewpoint from those that are not viewpoint discriminatory. Additionally, although Board Regulation 6310 states that the "written complaint will be considered by the Superintendent and the librarian in weighing the educational value of that particular book, filmstrip, etc., against the segment found objectionable to the complainant. Contingent with their decision, the material will be returned to the shelf for continued use, or

24

removed from library circulation[,]" this regulation both conflicts with and refers to Board Regulation 6241, which clearly states that the material "being questioned will be removed from use, pending committee study and final action by the Board of Education, unless the material questioned is a basic text." *See* Ex. 1, Ex. 4. Moreover, as the previous enforcement of the automatic-removal policy reflects, it is the procedure in Board Regulation 6241 that is followed. *See* Ex. 5, Ex. 6 ("Administration followed Board of Education Policy and Regulation 6241.")

The automatic-removal policy gives school officials unfettered discretion to suppress speech. ISD Board Regulation 6241 acknowledges that "differences of opinion" can arise about books and that is why the removal procedures, including the automatic removal of any challenged material, have been put into place and followed. *See* Ex. 4. Neither the appointed review committee nor the Board is required to follow specific guidelines for its review and the Board can disregard the recommendation of the nine-person review committee in making the final decision as to whether to restore access to the challenged material. In contrast, there are specific guidelines that librarians follow when initially selecting books to put on library shelves. On the whole, the policies grant government actors "discretion [that] has the potential for becoming a means of suppressing a particular point of view." *Forsyth Cty.*, 505 U.S. at 130–31 (citation omitted). Giving unfettered discretion to school officials and automatic removal of any material upon challenge, regardless of the reason, is not reasonable.

Plaintiffs acknowledge that schools "are not deemed public forums unless the 'school authorities have by policy or by practice opened those facilities for indiscriminate use by the general public.'" *Embry v. Lewis*, 215 F.3d 884, 888 (8th Cir. 2000) (quoting *Hazelwood Sch. Dist.,* 484 U.S. at 267, and *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.,* 460 U.S. 37, 47 (1983)). However, even in a limited, or non-public forum, government restrictions must be non-

viewpoint based and reasonable to withstand First Amendment scrutiny, and ISD's automatic-removal policy is not. *See Minnesota Voters Alliance v. Mansky* (striking down a Minnesota law banning voter from wearing a "political badge, political button, or other political insignia" inside a polling place as not passing the nonpublic forum reasonableness standard). Here, the "objectionable in any manner" standard triggering automatic removal is so vague that it constitutes no standard at all. *See Coates v. Cincinnati*, 402 U.S. 611, 614 (1971) (striking down ordinance that prohibited multiple individuals from assembling when they "conduct themselves in a manner annoying to persons passing by" because "[c]onduct that annoys some people does not annoy others," so "no standard of conduct is specified at all"); *accord Armstrong v. D.C. Pub. Library*, 154 F. Supp. 2d 67, 77–78 (D.D.C. 2001) (striking down a library policy that allowed refusal of entry to anyone with an "objectionable appearance" because it relied "only upon subjective interpretation of the term 'objectionable'").

### 3) ISD's automatic-removal policy violates due process because it deprives students of their fundamental right to free speech without notice, hearing, or the ability to appeal the final decision.

"The Due Process Clause of the Fourteenth Amendment prohibits state governments from depriving 'any person of life, liberty, or property, without due process of law....'" *Doe v. Univ. of Nebraska*, 451 F. Supp. 3d 1062, 1099–100 (D. Neb. 2020) (quoting U.S. Const. amend. XIV, § 1). "This clause has two components: the procedural due process and the substantive due process components." *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999) (en banc). "Analysis of either a procedural or substantive due process claim must begin with an examination of the interest allegedly violated, and the possession of a protected life, liberty, or property interest is a condition precedent to any due process claim." *Id.* (quotation marks, alterations, and citations omitted). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest

26

created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Here, Plaintiffs have alleged a deprivation of students' fundamental right to free speech, which constitutes a liberty interest. *See Am. Civil Liberties of Mo. Found. v. Lombardi*, 23 F. Supp. 3d 1055, 1062 (W.D. Mo. 2014). Once a liberty interest has been established, to establish a due process violation, Plaintiffs must show that they were deprived of this protected interest in a manner that failed to afford adequate procedural safeguards prior to the deprivation. *See Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 965–66 (8th Cir. 2015).

Here, Plaintiffs' minor children, all students at ISD schools who use the libraries and would like to have access to all the books in those libraries, are provided no notice that the automatic-removal policy has been triggered by a complaint, no notice that any book had been removed pursuant to the policy, no opportunity to be heard before the book's removal, and no appeal process after the final decision is made. ISD policy has no provisions requiring any notice be given to students or parents related to the automatic-removal policy.[4] The lack of any procedural safeguards before a student is deprived of their First Amendment right is a violation of due process. *See Jacobsen v. Petersen*, 728 F. Supp. 1415, 1423 (D.S.D. 1990) ("In light of the important First Amendment interests at stake in this case, and the lack of *any* existing procedural safeguards before or after a deprivation of property which is guaranteed protection under the Fourteenth Amendment, the only conclusion that this Court can reach is that Jacobsen's due process rights were violated.").[5]

---

[4] As noted, even though parents were informed after *Cats vs. Robots #1: This Is War* was removed in June 2022, students were never directly informed of the book's removal by school officials.

[5] In *Jacobson*, a newspaper publisher's newsrack was removed from a street corner without any notice or the existence of any procedures to provide notice. Therefore, both liberty and property interests were relevant in the procedural due process analysis.

## C. The remaining *Dataphase* factors favor entry of a preliminary injunction.

When plaintiffs have shown a likely violation of their First Amendment rights, the other preliminary injunction requirements "are generally deemed to have been satisfied." *Swanson*, 692 F.3d at 870; *accord Phelps-Roper v. Cty. of St. Charles*, 780 F. Supp. 2d 898, 900-01 (E.D. Mo. 2011). There is no basis for departing from the general rule here. Nonetheless, Plaintiffs also satisfy the remaining *Dataphase* factors.

### *1) Plaintiffs face the threat of irreparable harm.*

First, "a 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1101–02 (8th Cir. 2013) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion)). ISD's automatic-removal policy deprives Plaintiffs of their First Amendment right to access ideas and information. Moreover, this constitutional violation stigmatizes the library materials to which access is blocked, even if they are blocked temporarily or returned to shelves for some grade levels. The Eighth Circuit held that "this second, stigmatic injury is 'more significant.'" *PFLAG*, 853 F. Supp. 2d at 899 (quoting *Pratt*, 670 F.2d at 779); *see Pratt*, 670 F.2d at 779 (noting that, when a school district "has used its official power to perform an act clearly indicating that the ideas contained in [banned materials] are unacceptable and should not be discussed or considered [, t]his message is not lost on students and teachers, and its chilling effect is obvious"); *accord Counts v. Cedarville Sch. Dist.*, 295 F. Supp. 2d 996, 999 (W.D. Ark. 2003) (recognizing that the restriction of particular library materials may stigmatize those materials, resulting in stigmatization of those who choose to read them).

28

### 2) The balance of equities favors ongoing student access to library materials.

Second, "[t]he balance of equities . . . generally favors the constitutionally-protected freedom of expression." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by City of Manchester*, 697 F.3d 678. The preliminary injunction sought by Plaintiffs will not harm others. While this case proceeds, the injunction will prevent only further blocking of student access to library materials based on the automatic-removal policy. There is little risk of harm because, as noted, each of the materials in ISD's libraries has been selected for inclusion by a librarian based on the criteria in the selection policies, which are consistent with the applicable best practices and professional standards.

A preliminary injunction will not burden others. It is true that students, parents, and guardians would not have the ability to force ISD officials to immediately block access to a library material for every student upon submission of a complaint stating *any* objection to the content. To the extent objection to school library material is a right, it is not one found in the Constitution, so it must give way to rights protected by the First Amendment. Moreover, Plaintiffs are aware of no court finding that there exists a right to prevent *other people's children* from accessing particular school library materials. *See Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 760 (1996) (holding that "overly restrictive" regulations "sacrifice important First Amendment interests for too speculative a gain." (citations and quotations omitted)).

### 3) The protection of students' First Amendment rights is in the public interest.

Finally, "it is always in the public interest to protect constitutional rights." *Nixon*, 545 F.3d at 690; *accord Fuller v. Norman*, 936 F. Supp. 2d 1096, 1098 (W.D. Mo. 2013). The public interest is served by preventing future book removals under the likely unconstitutional policy

29

while this case is considered on the merits. *See PFLAG*, 853 F. Supp. 2d at 902 (finding public interest favors entry of an injunction against school library blocking access to website and recognizing "[v]iewpoint discrimination by a state actor is antithetical to the First Amendment, one of our country's most cherished constitutional rights"). The public interest supports an injunction that is necessary to prevent a government entity from violating the Constitution. *Doe v. South Iron R-1 School Dist.*, 453 F. Supp. 2d 1093, 1103 (E.D. Mo. 2006).

### D. Bond of $100 is appropriate.

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1105 (S.D. Iowa 2020). "The amount of the bond rests within the sound discretion of the trial court." *Stockslager v. Carroll Elec. Co-op. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976). A bond of $100.00 is adequate here, consistent with similar cases. *Ahmad v. City of St. Louis*, No. 4:17 CV 2455 CDP, 2017 WL 5478410, at *18 (E.D. Mo. Nov. 15, 2017) (setting preliminary injunction bond at $100.00 in First Amendment case); *O'Toole v. City of Walnut Grove*, 238 F. Supp. 3d 1147, 1150 (W.D. Mo. 2017) (same); *Abdullah v. Cty. of St. Louis*, 52 F. Supp. 3d 936, 948 (E.D. Mo. 2014) (same); *Traditionalist Am. Knights of Ku Klux Klan v. City of Desloge*, 983 F. Supp. 2d 1137, 1151 (E.D. Mo. 2013) (same); *Traditionalist Am. Knights of Ku Klux Klan v. City of Desloge.*, 914 F. Supp. 2d 1041, 1052 (E.D. Mo. 2012) (same); *see also Pence v. City of St. Louis*, 958 F. Supp. 2d 1079, 1087 (E.D. Mo. 2013) (setting bond at $10.00); *Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929, 952 (E.D. Mo. 2004) (declining to require bond for preliminary injunction). In this case, a preliminary injunction bond of $100.00 is appropriate.

### III.    <u>Conclusion</u>

For the foregoing reasons, this Court should grant a preliminary injunction enjoining ISD from enforcing its policy of automatically removing library materials from student access upon a parent, guardian, or student's challenge, while this lawsuit is determined on the merits.

Respectfully submitted,

<u>/s/ Gillian R. Wilcox</u>
Gillian R. Wilcox, #61278MO
ACLU of Missouri Foundation
406 West 34th Street, Ste. 420
Kansas City, Missouri 64111
Phone: 816/470-9938
Fax: 314/652-3112
gwilcox@aclu-mo.org

Jessie Steffan, #64861MO
ACLU of Missouri Foundation
906 Olive Street, Ste. 1130
St. Louis, Missouri 63101
Phone: (314) 652-3114
jsteffan@aclu-mo.org

**Attorneys for Plaintiffs**

<u>Certificate of Service</u>

I certify that a copy of the foregoing was served on the Independence School District by special process service.

<u>/s/ Gillian R. Wilcox</u>